State In this case, somewhat unusual posture in this case, the athletes are splitting their argument but they have, I think, sufficiently different positions with respect at least to the way the arguments are presented that I think it would be only fair to give everybody a little more time than otherwise, otherwise we're just going to end up having sort of a track meet up to the podium. So, why don't we, without specifying a particular amount of time, if that's all right, we'll just be, don't, when you see the red light come on, don't feel that you have to start gathering your papers and sitting down. We'll give you a little extra time. With that said, Ms. Cannon. Thank you, Your Honor. This case, as you said, is unusual in that the International Trade Commission admits that its decision on remand is unlawful in a number of respects. We agree. Our difference is that the commission believes that this court compelled it to undertake the analysis and reach the negative decision that it did, and there we disagree. This court has had no opportunity to provide further direction as to the meaning of the BRASC and Caribbean ISPAT holdings. But a number of parties, including Mittal here, the plaintiff in the BRASC case, and two members of the commission have stated that the BRASC language could be read as simply requiring a more stringent non-attribution test in the causation analysis rather than the creation of an entirely new replacement benefit test as the commission did here. That reading does fit with the arguments that were presented below. As you know, the genesis of this case was an appeal that Mittal brought saying that the commission had not properly determined and analyzed whether imports from Trinidad alone caused injury, and it hadn't made sure that it wasn't attributing the injury caused by other imports to Trinidad, that it wasn't mistakenly doing that. On remand here, the commission did precisely that. It went back and it looked very carefully at imports from Trinidad alone, and it went through an extensive analysis and explained why imports from Trinidad alone, separate and apart from the other imports, were a cause of material injury. That is all the statute requires, and the commission says if it had stopped there, it would have issued an affirmative decision. We believe that that is sufficient under the statute, and it's also consistent with what this court was essentially requiring. Even though this court did discuss in broad the ideas of replacing other imports, essentially what it was trying to accomplish, a la Gerald Mittal, was looking at a causation test, was looking at attribution. And so our position is that to the extent that you have a holding by the commission that set forth very clearly that the imports from Trinidad alone were a cause of material injury, that should be inefficient. I'm a little unclear. Accepting Caribbean and BRASC and the order or whatever it said on remand, what do you think was required of the commission to do on remand with respect to replacement of the imports? Well, that's the problem here, Your Honor. I mean, the court did say look at replacement, and to the extent that the court was contemplating that, then we get into the question of is that correct to really go beyond attribution and look at replacement? Because the problem with that, as the commission said, is the anti-dumping law is not predicated on imports leaving the market. But I thought you were making two different arguments here. One is that if the commission was right in the way it construed what our cases say, they may be contrary to the statute. But I thought you also had an argument that even following the remand order in Caribbean, the commission overdid it. You're right. And that there is a way. So I'm asked to try to find out how, if you were on the commission, how you would have construed the requirement with respect to explaining the replacement or where they would have replaced it. My response to that is twofold. First, I think it is somewhat ambiguous what exactly this court was requiring. And that's what the commission was saying. There is an initial question as to whether a replacement benefit test is not needed at all. And that it runs us out of so many legal principles. Do you think there's any ambiguity in the remand that this court was requiring some sort of replacement test? The language seems to suggest that, Your Honor, that there was some type of a replacement required. And if that's what the court contemplated, obviously that's what we're here for today, to clarify to the commission, to us, exactly what the court meant. To the extent the court did require a replacement test, we do think as applied it was incorrect as well. We think that the commission went way beyond what had to be done here. Well, what would you have done, assuming, accepting that there's some requirement of some sort of replacement issue, what would you have done? The first thing was with respect to the triggering factor that the court identified on commodity product. In the commodity product analysis, the court says you first have to look at whether there's a commodity product. And here, the court quoted to some other language, separately in the commission's opinion, where it talked about the fungibility of the imports with other imports. And I've read the book, and I know your argument on commodities. Can we leave commodities, but get by that? I'm talking about... The rebuttable presumption issue? Well, yeah. Or whatever... Well, the basic arguments we made were on commodity product, on the rebuttable presumption as applied, and then on threat. Okay. On the rebuttable presumption issue, there's nothing in the court's decision that requires a rebuttable presumption be applied here. And in fact... We're talking about BRASC. In BRASC or in Caribbean ISFAT, either of these cases... Caribbean ISFAT was... Was basically quoting BRASC. I was the author of Caribbean ISFAT, and I... I guess speaking almost out of school by saying what the court was doing, as you're trying to do, but it was a remand in light of BRASC. So presuming, just accepting BRASC as the binding law at that point, sending it back in light of the principles established by BRASC. But let's assume that that's all that Caribbean ISFAT did. So we're really talking about what BRASC requires. And how do you see the BRASC... Well, let me just be specific. The sentence that seems to be the source of the problem here is the sentence at the end of part two, I think, of the BRASC opinion about talking about the commission's burden to demonstrate that the subject imports themselves caused the domestic injury in the context of the replacement benefit analysis. How does... How do you go about saying that's not establishing a presumption? That says that the commission is supposed to cite to evidence. What it did not say was that the commission was to basically impose a burden on the domestic industry, on us, to come forth with the evidence as to what the foreign producers were likely to do. That's what the commission did here. It said, if we think that there's some indication that the other imports could have replaced it, we are going to assume they would replace the other imports, even though they say there is no evidence. They specifically say that there is no evidence on the record to support that determination because that's the way we feel our hands are tied. And we feel we must basically impose a burden on the domestic industry, in effect, to come forth with evidence of this type because the foreign producers weren't even the parties here. They weren't going to come forward with the evidence, nor would they. Why would they come forth with evidence that wasn't against their interest once the presumption was in their favor, Your Honor? The only people that would be incentivized to put that information on the record to try to rebut the presumption, who are otherwise going to lose the case and get a negative decision, would be the domestic industry. These are arguments that certainly go to the question of whether BRASC was wrongly decided. What I'm having trouble with and where I want help, if you can help me, is put yourself in our position and tell us how you would write an opinion, starting with the presumption, starting with the binding and irrebuttable presumption that for now, at least, we're bound by BRASC, like it or not. How do we write an opinion that says the commission got the language, the particular language of BRASC wrong? Where did the commission go wrong in reading BRASC too broadly? Okay. With specificity because BRASC has, as I counted them, three sentences that really are pretty specific and in reading through it, it's so hard to get around it. I'm sure you're familiar with what they are. Yes, I am, Your Honor. That's why we try to include in our BRASC some of the other case citations to some principles such as you shouldn't assume that every single word in a particular court opinion needs to be construed. Okay. I understand. Start with the assumption that we really want to try first out of the box to be as faithful to the language and the gist, if that makes sense, of BRASC and not try to slide around it. We want to try to be faithful to it. Given that task, how do you write an opinion which says this case should result in not affirming the commission's reluctant decision to find no injury? There have been other cases that the commission has decided in applying BRASC where it has not applied this rebuttable presumption, where it has gone out and gathered additional information and has been able to look at other information such as information provided by foreign producers to what they would or would not do, not could do, what they would or would not do. Here, they had very little time. They asked for additional time from the lower court. Natal opposed that request. The lower court denied it, and so they didn't have time to gather some of the information. If you look at the BRASC case itself, Your Honor, there was a remand issued there. The remand was affirmative. It continued to find injury, and one of the things they said was theoretical capacity isn't enough. We're looking beyond that and whether there would be actual replacement, so they did go beyond that. The Tropicana case, which was another case where- Counsel. Yes. I thought you would get to the possible disjunction between could and would. Yes, Your Honor. In that respect, defining that something is a commodity, which is fairly crucial, leaves you with only one basic factual issue, and that is that people have the capacity to produce the commodity because one of the basic laws of economics is that if you have a commodity, which is interchangeable by definition, and you have other producers who could produce it, could gets you to maybe 99% of would because there is no economic motivation to do anything but fill that marketplace, and I thought one of the points of attack here had to do with the assumption or finding that this was a commodity in the first place. Am I wrong about that point? No, Your Honor. You're correct in two respects. First, we are challenging that this is not a commodity, and my diversion to the rebuttable presumption was in answer to Judge Crow's question who asked me to skip past that for the moment, but let me answer also your second assumption, which is it could get you 99% to would. I respectfully disagree. When you have products in the market, the commission looks at this all the time. They do this in a five-year sunset review where they're trying to ascertain when foreign producers have capacity, whether that capacity likely would be sent here, even in a commodity context, and what they find is that it really depends how much excess capacity they have, not total capacity because their capacity is already being used and being sent to whole markets or other places, so total capacity doesn't get you there, and also beyond that, is there some reason to do it? Are there higher prices in the United States, say, than in Europe because if there's not, maybe they want to sell to Europe instead, and they look at intentions. They look at what the foreign producers say. Here, that was one of the very strong pieces of evidence on the record. In fact, where a number of the foreign producers said, we're not planning to sell anymore to the United States, but the commission, even in the threat context, found that it was likely they were going to replace, so there was evidence indicating that could did not mean would in our view on the record that the commission failed to address. So what's wrong with what Brask said? I mean, why would you take issue? Okay, so you've established whether they could, and you've got an evidentiary record of whether they could, so why isn't Judge Zagel right? You've enumerated what the commission, Brask says that the commission has to explain in a meaningful way why the non-subject imports would not replace it. Seems to me, hypothetically at least, that you kind of explained or at least touched on the factors in which they could easily comply with Brask's. Only if they had that information. Going one way and going the other. Only if they had that information, Your Honor. The problem with Brask is it requires them to have information on a lot of imports that are not, where the companies are not party to the case, but they're not answering questions. Is that true of this case? I mean, you're right. You may be right hypothetically with respect to all cases in general. What about this case? And this case. And Judge Zagel points to lots and lots of evidence, certainly with respect to capacity and pricing and excess and all of that. In this case, the record is mixed because there were some imports that were subject imports, and for those, the commission gathered data. Non-subject imports, though, is just like other cases. So we have a range, and there was not data on a lot of imports. Even on the subject imports, Your Honor, this is where the problem was on the threat analysis. The commission was finding that those subject imports would come in and replace even though they were going to be subject to duties. How could they do that? If the whole predicate of Brask, which I disagree with respectfully, I do not believe it is true that a dumping order means that imports will leave the market. But if, as Judge Bryson says, we take it as written and we assume that, you have to assume that the dumping orders and all the other imports was going to cause them to leave the market, too. How do they replace for purposes of future imports? They can't. The commission didn't address that. So that was a fundamental flaw. But I'd also like to get back to your question about commodity. We very much disagree that this is a commodity, but more importantly, we disagree that the commission reached a finding on commodity. All the commission said, the majority of the commission, was we feel constrained to find it's a commodity because the court ordered a sentence of what we said in another context. And the commission carefully explained that that other context was different. That was for accumulation and that they had different analyses in different contexts. So to just say we feel constrained and it appears the court required, if you look at the actual decision of the commission on commodity, you will see it reads almost verbatim with what the dissent said in terms of analyzing the record factors. And the dissent actually did undertake the analysis and they found it was not a commodity. The wire rod comes in 11 different types of products and a wide range of different types from different countries. So you can't just assume that any type of wire rod from one country would automatically be substitutable for another. If that factor is not met, you don't even get to the replacement benefit test as the commission has enunciated it. I take it that you would, well maybe I don't take it, I'll just ask. You would agree with Chairman Pierson and I think Commissioner Okun's views as to the soft as opposed to the hard reading of Bratsk that there are two ways to read Bratsk. One is to read it in effect the way the commission here has read it but then a softer reading would be not to impose the kind of rigid replacement benefit test that the commission concluded in this case that we're bound to apply. Absolutely. And you think that Bratsk can fairly be squared, the language of Bratsk can fairly be squared with the soft reading? I think it can because I think if you don't, you're struggling then to align so many of the fundamental legal principles that fall out of that with other aspects of the decisions of this court too. It's not simply following Bratsk that is an issue here. It's following other principles that this court has enunciated. In Newport, for example, this court said that imposing an order doesn't automatically lead to imports leaving the market but that's what Bratsk is premised on. In Newport and in a couple of other cases, this court has said you can't have a stringent rigid causation test. We're not going to require that. It's up to the commission to determine how it will apply the statute but this test violates that. This court has said in Zenith and other cases you can't have rebuttable presumptions against parties not in a position to rebut them and yet this replacement benefit test violates that. So I think when you have to determine how to interpret and apply what the commission has done and whether what it's done has been faithful to what this court held, you have to look not just at Bratsk but at the other line of cases that you have issued that this court has issued where you recognize these other principles that are very much out of line with the replacement benefit test fundamental assumptions. One of the assumptions I haven't mentioned is that there's basically an assumption that the relief has to be effective to be provided. Now that assumption is very much out of line with the statute itself. The statute makes no mention of that. Would you concede, assuming that it is proved, and forget who proves and forget about the burden, if it were proved, would you concede that it were proved that there would be absolutely no benefit of any sort to the claimant, that there's no case? No. No, the statute does not contemplate that you even look at that statute. I know that the statute doesn't, but ordinarily, generally speaking, you don't get a judicial equation, a judicial remedy, unless there's something that comes out of it. It really dates back to the case of controversy clause. I mean, that's what concerns me. If you sue for nothing, if you go through this long, expensive process, expensive not only to the parties, but to the commission, the court of international trade, and this court as well, and we spend all of these resources in all that amounts to something which we know, and that's my assumption, that we know, will result in a zero benefit, why are we doing it? Well, first, your assumption, I think, is very much wrong. Don't fight this hypothetical. But I'll accept the hypothetical. And accepting the hypothetical, I would say two things. You look at the statute, and Congress set forth a statute and said, this is what you have to look at. And if these factors are met, you issue an order. It said nothing about looking at effectiveness of relief. But what it did say, Your Honor, was, we're going to add another aspect to the statute, the five-year review. And after five years, the commission will look back, and we'll look at the effectiveness of relief. We'll look at what the benefits of the order or the effects of the order have been, and we'll decide whether to keep this order in place or revoke it. So it wasn't that Congress was not mindful of what the effects might be. It gave the commission, in the statute, specific instructions. And in fact, the commission is now undertaking a five-year review of this very order and the other orders that were issued to determine whether they should be left in place or not. The other thing I would say is that the way that this court in Bras talked about effectiveness was looking only at volume effectiveness. It didn't consider price effectiveness. These orders can be very effective if you put them in place, and imports from Trinidad could have stayed in the market but just raised their prices so they weren't dumping. There wouldn't have been anything to replace, but the industry, the domestic industry, would have benefited because we would have been competing with imports that were priced at our levels. 70% of their imports were undercutting our prices when this case occurred. That alone would have been a huge benefit to the U.S. industry. So there are other aspects of effectiveness that this court has recognized that should be considered. The other thing I would say, Your Honor, is that even if you would say we would impose relief from Trinidad and somebody else might come into the market after them, we see that a number of times. We represent a lot of U.S. industries where we see that pattern. What do you do? You bring another case. If they're dumping, you bring a case against them, and you seek relief. It may be a series of cases, but that's what the law provides and contemplates. I hark back to the hypothetical I believe we discussed at the panel below where we were asked whether somebody was mugged in an alley. He said, Well, you can't blame me because there was a guy right behind me that would have mugged the person but for me being there. Is that a good excuse? Well, that's what Trinidad's saying here. They're saying we weren't found to be guilty of causing injuries. We were found dumping. I didn't murder the defendant. He had a fatal disease and was going to die later that week. Not a very good defense in a criminal case. You say not a very good defense here either. But not a good defense here either, Your Honor. That in a nutshell is where this test takes us. It takes us to a conclusion that an import that is found to be dumped, that is found to be causing injury independently from everybody else still could get out of the case if there was some indication that somebody could, not even would, could come in theoretically and cause injury instead of them. And therefore, the release that we were entitled to under the statute was deprived of us and a negative decision was issued solely on that basis. That cannot be right under so many aspects of the law of this court that I've enumerated separately. That simply cannot be the right result. Very well. Why don't we reserve your time and we will give the two appellees additional time, at least roughly according to the amount of extra time you have. So, Mr. Lyons? Yes. Good morning, Your Honors. Good morning. First, let me thank you for the additional time. Following after Ms. Cannon, I must say that the commission is very much torn by this case. I think this panel must understand, given our petition for a rehearing following the Brass case, the remand determination here in our brief is that we share the appellant's concerns with regards to the Brass test. And the appellant here has described many of those difficulties quite eloquently. We share those. I think foremost amongst those probably are three different matters. One, the fact that the court's decision basically does away with the idea of injury from simultaneous but distinct causes. The idea that you could have injury both from the subject imports and from other non-subject imports is really lost by the replacement test. Likewise, we share the view with regard to the issue of effectiveness. Nowhere in the statute is the issue of effectiveness really addressed. And the legislative history and the sunset provision itself actually argues against that type of an analysis. So your position is that there should be no articulation, no test, no consideration of replacement? That's correct, Your Honor. The commission has traditionally examined the role of non-subject imports in its causation analysis. So for instance, a situation such as existed here where there are significant other non-subject imports in the market, that is a matter that the commission would traditionally examine in determining whether the subject imports caused material injury. But that's quite a different construct than looking at replacement. To give you an example, you could have a situation where you have other imports in the market, let's say you're the price leader. The commission could quite plausibly reach a conclusion in the case that by virtue of the price leadership of those dominant imports, any subject imports, which in a particular case may have been very small in comparison in terms of their volume and quantity, simply were not a distinct cause of material injury. Now that would be very factual and dependent upon particular cases, but that's the type of analysis the commission would undertake. The mere examination of whether replacement would occur has two difficulties with it. The one difficulty is that it undertakes an assumption that replacement would occur, which is not necessarily a legitimate assumption. We all know that in many instances... But what about... Well, let's forget the assumption. It undertakes an inquiry. Should there be an inquiry? Not an assumption that replacement should occur, but at least an inquiry. There's something improper about an inquiry into whether or not there would be replacement. Well, I wouldn't say that the inquiry itself is inappropriate. It's the particular circumstances of BRASC where the inquiry is actually elevated to a rebuttable presumption in our view. Okay, so your view is that the inquiry into the replacement is a legitimate inquiry with respect to causation? Well, I would characterize it in a different way. I think it is a very legitimate consideration for the commission to examine what else is going on in the marketplace. If there are significant non-subject imports in the marketplace, it's incumbent upon the commission to examine their role. I would disagree with replacement, mainly because replacement hypothecates that something is going to occur, and it's focusing on a very narrow aspect, and I would submit it is an appropriate aspect. You're shifting the focus from what is the role in the marketplace of those other non-subject imports, if they're significant, which could involve many different aspects. Are they more competitive for a particular reason? What is the quality? What are the grades of those imports? There's a whole host of different factors that the commission traditionally examines, which are very appropriate matters for the commission to factor into its determination. The problem we have with the replacement test is twofold. It's that it focuses things almost to the rejection of others, and it also is fundamentally based on an inappropriate assumption. Here, I can't help but get to something that Judge Zagel raised, and that's the issue of commodity. Judge Zagel was suggesting that here, when you have a commodity, in economic terms, putting everything else aside, you would expect that they're totally interchangeable and substitutable for one another. The difficulty with that is that the definition of commodity that was set forth in the brass case is a very broad definition. The definition is generally interchangeable, and that's a marked departure from what we the court there, when it first looked at the question of replacement, was examining something that the court itself described as perfect subsidies. You had a situation where the product involved from Russia was indistinguishable. The only thing that differed in that case was whether it was sold through a different trade company or not. We have an extension in brass, citing back to Gerald Metals, which I hesitate to mention, but we were chastised in brass for trying to limit it, limiting the precedential value of Gerald Metals. We thought we did nothing of the sort. What we did was we examined Gerald Metals in the factual context in which it was decided and thought that factual context was quite different from what we saw in brass and what we have here is packed Caribbean. Ms. Cannon has addressed the issue of commodity, and I'd like just to turn to that for a second. Before you go, let's take commodity off the table. Let's assume we all agree this is a commodity. I'm still not clear on your position, and leave aside that this may be a complicated inquiry and may be incapable of resolution in at least some instances where you can't get the information, whatever. Leaving all of that aside is not at least an effort to make an inquiry. Brass has two triggers. One is the commodity, and the other is that there are non-subject imports. Are you objecting, if those two triggers are met, to at least an inquiry with respect to the replacement issue? Yes, Your Honor, because it's a different inquiry than what we believe is appropriate. The inquiry is what the role is of those other imports in the marketplace. The reason is that when we're examining the question of present material injury, whether there's present material injury in the market, we're essentially taking a snapshot of what exists based on our current investigation, which is typically a three-year period. We're looking within the confines of that current investigation to determine what is happening in the marketplace, is there injury, and if there is, what has caused it. That, we believe, is the proper construct. It's one that the court has repeatedly adopted and endorsed. Replacement does two things. Replacement looks outside that period, and rather than looking at what is a factual matter and relying on factual findings by the commission and then an assessment, a legal assessment, instead of allowing for that, what we're being asked to do as a replacement is basically to hypothecate and project what would happen. Let's assume not, okay, except the facts are indisputable and conclusive that there are other companies who have come in and shown and demonstrated that they could have come into the market and they would have come into the market. Memos saying, if these guys are out, we're in. Let's assume the facts are just there and there would have been replacement of a commodity. Is that it? A proper inquiry for the commission or proper consideration? We would just address it in a different way. We would address it to see what the role of those other non-subject imports were. It may actually get to the same end point, but all I'm submitting is that the replacement issue, and I understand the way you phrased the question, but it carries so much baggage with it in terms of the impossibility of drawing those types of conclusions. This is a perfect example. Is it the word replacement that's causing the difficulty here? I mean, it sounds like you're not saying anything that's all that different from what I understand Judge Prost's question to be asking, but you don't like the word replacement because you think that there are a lot of instances in which there just won't be replacement. Well, that's correct, Your Honor. Plus, it raises a whole category of questions. Before we get away from that, and I don't want to distract you from responding to Judge Prost, but in Judge Prost's hypothetical situation, I think you were about to say, well, it would be appropriate for the commission to look at these other factors, these external factors with an eye towards, and you were about to say what? Well, what I was saying was that if you have a situation where you have non-subject imports in the marketplace, or let's say just significant, they may not be dominant, the examination would be what is the role of that, and it would be twofold. Under the statute, we're looking at the question of volume. We're looking at the question of price. What you most readily probably see is whether the existence of those significant imports would deprive a lesser quantity of subject imports of a price effect, and that is going to be very much driven by the facts of a particular case. That is forward-looking in that sense, right? I mean, you are saying what would be the effect of issuing an order. Well, no. You're not looking at the effectiveness. You're saying you're really looking at what's occurring during the period of investigation, and you may see, for example, and I suppose Taiwan Semiconductors is perhaps a good case where we had products from two different countries, Korea and Taiwan, subject to investigation. Commerce had gone negative on imports from Samsung, so they were non-subject imports, and the Commission was looking at the different factors and how they affected the marketplace. One of the things, but here I've got to emphasize that it was only one, was that the Commission looked at those non-subject imports, the fairly traded imports from Samsung, to see what effect they had on the market, and whether their presence in the market resulted in the situation, and we're looking, not forward-looking, but in the terms of the period of investigation, whether they were the predominant and so significant basis for the price effects that, in effect, the subject imports were tangential, minimal, de minimis. Isn't that another way of saying that if you imposed an order on the subject, there would be no difference in the market? Yes, but the focus wouldn't be exclusively on the one factor, which the BRASC construct basically makes such an important factor. What is the factor? I'm not sure which factor you're talking about now. The factor of replacement and whether replacement would occur or not. The question of replacement begs the question in so many ways. Okay, replacement occurs. What period would it occur in? Would replacement take two years to occur? Would it occur in six months? What would replacement be? In this particular case, for example, we have producers in 41 countries producing wire rod. It might take 10 of those to replace the subject imports from Trinidad and Tobago. Does that make a difference if 10 would be necessary to replace a product from one? Part of the difficulty we have is with the complexity that the replacement test creates. Part of it is with the difficulty in terms of the information and our access to usable information. This case and BRASC both, in our remand determinations, presented the difficulty of obtaining usable information from non-subject importers. In the BRASC situation, we sent out questionnaires to producers in 17 different countries. We received responses from only four. I guess I'm having a hard time understanding why that's so problematic in light of the instructions in BRASC. Can one not fairly read the instruction of BRASC that the commission just has to explain, has to answer why? It seems to me that you argued some factors here. I mean, why do you read BRASC as requiring anything more than what you're trying to do here, which is to come in and say, this is the reason we're not concluding there would have been replacement? And listing all of that and describing the difficulty in getting information, the ambiguity of the information you have, how it's inconclusive, what is it in BRASC that you read that would require the commission to do anything other than that? Well, essentially, for us, it's the language, the opinion itself. I mean, this is where we've indicated, and the commission in its remand determination indicated that it believed that BRASC opinion essentially created a rebuttable presumption. Is the rebuttable presumption, you think, the product, principally, of the sentence that I read to Ms. Cannon? That was the end of... Well, there's several, but certainly the very last sentence in the opinion, I believe. The last sentence in the opinion is the point that the commission has to explain why the non-subject would not replace the subject in port. Correct. But the sentence that I thought was the principal focus for the argument that the BRASC creates this rebuttable presumption was the sentence at the end of Part 2, talking about the commission's burden not the subject importers to demonstrate. That's right. I think the two of those combined with a couple of others, the language I think you're referring to is the burden that's on the commission to demonstrate in a meaningful way why the non-subject imports would not replace the subject imports and continue to cause injury to the domestic industry. Whether you characterize it as a rebuttable presumption or not, what is essentially the BRASC opinion has created is a requirement that the commission make a particular finding of fact in the conclusion of law, and if it cannot do that, then implicit in the BRASC decision is that the commission must find that the subject imports are not causing material injury. So whether you call that a rebuttable presumption or not, the burden and the onus has been placed on the commission to make a particular finding absent evidence of the contrary. And here the finding that the commission is compelled to be made, and it's said several places in the BRASC opinion, is absence and explanation and evidentiary finding by the commission that non-subject imports will not replace the subject imports. Then the explanation is unsatisfactory. Well, what does it mean when an explanation is unsatisfactory? We must assume that would mean that our determination would not be sustained, it would not be affirmed, and in the situation where we have a simple dichotomy, you either have material injury caused by the subject imports or you have material injury not caused by the subject imports, the wording of the court's opinion to us is plain that it dictates that absent a finding that non-subject imports would not replace subject imports, the causation analysis is inadequate in the opinion of the BRASC panel. And that's why the commission phrases rebuttable presumption. Whether that was appropriate characterization or not, that, in effect, is what's required here, and that's what the commission did in its remand determination to examine the issues of replacement, examine the issues of commodity. Turning just very briefly to the issue of commodity, I would mention that here, in fact, the commission did make a very specific finding. It's very clear at Appendix 632 that that finding was specifically made. It was premised on two different considerations. One was the application of the BRASC court's definition of commodity, which was a product that was generally interchangeable. The commission referred to the information it had on the record with regard to interchangeability. It had made that finding in the context of accumulation, and while the commission protested that that wasn't specifically how it would define commodity, that's how the court defined commodity. In addition to that, the commission, in its original determination, and that can be found in A99 of the appendix, made a finding that the imports from Trinidad and Tobago, which consisted of 90% two different categories of wire rod, both of them being low-priced industrial-quality wire rod, the commission specifically, if you look at its original determination, made a finding in the volume portion of its determination that those types of wire rod, which were available from Trinidad and Tobago and many other countries, were a commodity product. So there's a specific finding, both in its original determination, which was adopted and incorporated in remand determination, and in the remand determination as well, which I think brings us perhaps to the final point, and that's... In the remand determination, before you leave that point, so your view is that quite apart from the commission's feeling bound by what was said in Caribbean ISPAT about the... with reference to the language of the interchangeability. Yes. Setting aside the extent to which the commission felt that they were foreclosed from examination by themselves on the issue of commodity, that the commission concluded that these were commodities. That's correct. And what do you... Setting aside, again, the first commission determination, what is the language in the determination under review here that you think most clearly points to that conclusion by the commission? Well, the discussion occurs on appendix 631, 632. Right. And it's primarily on 632. And you're right, Your Honour, the... A lot of it is... The tone of a lot of it is our hands are tied. And I can certainly understand why the commission would have drawn that conclusion, looking back at the language of Caribbean ISPAT and BRADS. But what I'm looking for, is there really an independent determination by the commission on the issue of commodity such that, if we were to say that there was no intention to tie anybody's hands and that any reference to interchangeability was merely an allusion to the issue as to which a finding needed to be made by the commission, would the commission have the freedom, in light of this determination, to reach a different conclusion, or would the commission already have reached such a conclusion? No question. Your Honour, I think there's probably two portions to the response to that. The first, which I alluded to, was that, in fact, in the original determination... I understand. ...the commission made a finding. Now, I must say that, again, that finding that the industrial grades, the industrial categories of wire rod were a commodity product, is not a finding that all the wire rod under investigation was a commodity product. That's something different. But what was important here, at least in the context of the BRADS construct, was we were being asked to determine what would replace the imports from Trinidad and Tobago. And since the imports from Trinidad and Tobago were concentrated in the industrial grades, that was an appropriate focus for the commission. Secondly, in the remand context, whereas you rightly point out that while the commission certainly felt that there were some... that had addressed this issue and perhaps wrongly had construed the commission's views on interchangeability to connote its acceptance of the commodity characterization, what the commission said in its remand determination was two things. One, applying the BRASS courts definition of commodity. And, again, I want to emphasize that's a BRASS courts definition. And it's whether the products are generally interchangeable. And that was focused on a consideration by the commission with regard to what it does under the accumulation aspect of its determinations and considering whether there is generally  to include collectively in the aggregate imports from different countries. I think the commission has indicated, at least implicitly, that that is not how it would normally define commodity. Commodity would be much more in the terms, I think, that Judge Zagel has indicated, where you have a product, let's say, and forgive my inexpertise here, but let's say, you know, bituminous coal or something. You know, the coal doesn't really matter whether it's coming from one source or another. I'm sure there's aspects of that that I'm ignorant of. But submitting something like that, which is not as differentiated as wire rod can be. The wire rod, in this case, if you're looking at, for example, the tire bead and some of the more exotic and expensive types of wire rod, those clearly are not commodity products. And the commission never would have found, at least this commission did not find, that the broad range of wire rod products would be a commodity. Instead, what it did was applying what the brass court did in its definition and what it understood this court to have been comfortable with, found that the commodity requirement was met here for purposes of going on and triggering a replacement test. Now, one final question. We've really made you work overtime here, but this is helpful. Let me ask you the same question that I asked Ms. Cannon. If you were sitting here and your constraints are that BRASC is binding on you, but that you're aware of the arguments being made, what would your approach to this case be as a panel bound by BRASC? How would you say this case... And let's say that we think the commodity issue is actually on the table. Now, I understand the commission... You're in an awkward position because you're defending a commission order which has read BRASC and Caribbean ISPAT in a so-called hard way. Now, do you think that there is force, a way to read the BRASC case, a plausible, legally permissible way to read the BRASC case in a softer way, a la, let's say, the Chairman Pearson, Commissioner Okun's suggestion as to the other way to read BRASC? Maybe that puts you in an impossible position because you are defending the order. Well, Your Honor, I don't think so. I appreciate your willingness to let me off the hook, but if I can respond, the commission's remand determination is based on its understanding of the BRASC opinion and this court's opinion in Caribbean ISPAT and what it was believed it was being directed and instructed to do. However, if we got that wrong, we'd be the first to stand in line to support a different reading and a less harsh reading of BRASC because of the reasons that Appellant and we have outlined in terms of the difficulty it presents. So what we would see is something that's more akin to the type of analysis that this court has endorsed in the past in terms of being an acceptable approach, not instructing us that only one approach is satisfactory, but endorsing at least an approach. And that's just the emphasis that when there are non-subject imports in the marketplace and they are significant, that it's incumbent upon the commission to examine what the role is of those non-subject imports and whether in examining that role. And here I get into a little difficult area because the statute in its legislative history tells us that we're not required to weigh causes. And that's something that this commission very much... Once you get over the level of trivial cause. Right, but at some point, particularly if you're looking at something, whether it's tangential and de minimis, there is some type of comparison going on there. It's not comparing whether they're causes or not, but they're at some point where you're looking at the cause and you're making a determination. And this is where we're getting into ground that's somewhat uncomfortable for us because we don't want to be in a situation where we're comparing causes. We think that would be definitely inconsistent with the statutory framework. But that doesn't say that the commission cannot focus on whether the subject imports are causing injury, which is material. And part of that is to examine what's going on in the marketplace and to find that the result of dominance, for example, of other imports precludes a much smaller quantity of imports that are subject to investigation from having an effect. It's something that's going to be determined based on the various facts in the case in terms of what's driving pricing, what are the non-price factors, the different issues that are there present in the market. It also has to do with what's shifting. Are non-subjects increasing and the others declining? Are they static? I mean, as you know, much of what the commission looks at is trying to connect the dots in terms of what are the trends. If we're seeing imports increase but prices are also increasing, well, maybe there's less of a link, but maybe you still have price suppression. The difficulty we have is that fundamentally our cases are so factually driven that when we're giving an instruction to apply a particular methodology such as this, which has real tensions with the statutory framework, it leads us down a path. It's hard for me to square the language that's currently in Nebraska opinion, particularly with regard to replacement, with what this court has long accepted as an appropriate methodology by the commission in terms of its causation analysis. I don't think I've done justice to your question. That's quite helpful. I appreciate your candor. Thank you, Your Honor. I've been generous with your time. Thank you. We'll hear next from Mr. Moran. Now, Mr. Moran, you sort of have... No relation to the first Mr. Brown. Right. Two people who are essentially, largely arguing against your position here, notwithstanding that you're on the same side of the... Well, Your Honor, I didn't have the temerity to actually ask you officially for additional time in light of what you've acknowledged, but I'm very grateful that you've given it because we are sort of an awkward position here. Yes. We understand. So, there are really two things going on with your questions this morning. There are a series of abstract questions about how the court should interpret Bretsk and Caribbean ISFAP. And then there's the substantial evidence part of the issue.  its negative determination with substantial evidence and provide the reasoned determination that decades of administrative law require them to do. I'd like to just touch briefly on the commodity question... They're not separate questions, really, because if the commission wasn't compelled by the hard reading of Bretsk... Let me go to that. It might come out differently with respect to the second question. Let me go to that. That's, to me, the soft interpretation of Bretsk that commissioners Okun and Pearson have described. I agree with, to an extent, and it's in this way. They articulate quite clearly that the foundation of the analysis in Bretsk springs inextricably from the Gerald Meadows decision and the by reason of causation standard in the statute and what the court, in that case, interpreted that to require. Where I part company is the notion that somehow the replacement test is brand new and created out of whole cloth. And I just want to read to you very briefly three excerpts from the Gerald Meadows decision. This is on page 721 of F-30. And you're just setting up the case. First, the Court of International Trade found no evidence supporting Gerald Meadows' claim that fairly traded Russian imports would have replaced all or the greater part of the subject influence. There's then about a page of analysis where the panel disagreed with that conclusion. It then concludes, quote, Without further explanation, this court cannot adequately review the Court of International Trade's dismissal of the prospect that fairly traded goods would have replaced less than fair value goods. One page later, in summing up, in describing the scope of the statute, quote, Its scope of protection does not reach so far as to support artificially inflated prices when fairly traded imports are underselling the domestic product. Where are you reading right now? Now I'm on 722. Okay. Left column on the F Reporter. All right. Go ahead. It's above Head Note 7 if you've got the Reporter series. Yes. So while the statute protects... Okay. The scope of protection does not reach so far as to support artificially inflated prices when fairly traded imports are underselling the domestic product and LTFE imports are readily convertible, i.e., readily replaceable for, fairly traded product by merely changing importers. That was what troubled the panel, and it sent the case back. And if you look at what the CIT did on remand, it's even more clear that the commission in that case on remand and the court here perfectly understood what the court was about. If you've got a commodity product and an ample supply of non-subject imports, fairly traded imports, the commission can't meet its obligation to find that injuries by reason of the subject imports without explaining, based on substantial evidence, why this ample supply of a commodity product that fundamental economics tell us will come in and replace, why that wouldn't happen and completely eliminate any benefits to the domestic industry. And in that context, the benefit means it's impossible to say that during the period of investigation that injuries by reason of the subject imports, if you assume they were out of the market and the domestic industry would be absolutely no better off. That's what the commission was, that's what the panel was saying in Gerald Nettles. And BRAS, in my view, it's simply a re-articulation of that absolute bedrock principle that the by reason of standard requires a reasoned explanation supported by substantial evidence. But what about the argument, and you may be right that it may not be applicable in all aspects to this case, but what about the argument when there's no information available? Not even to establish the could, let alone the would. I think that there are abundant sources of public information about these industries. And if the commission is in a position at the outset of the investigation where it knows that it has to conduct this kind of analysis, then it includes in its questionnaires to the importers who it already is seeking information from, the entire range of people who are importing, please compare the products under investigation with other products. They do this already. Now what they wouldn't have is the confidential data from the foreign producers about their capacity and capacity utilization and their patterns of shipment to other markets. But I want to emphasize that in this case, that issue is entirely a red herring. Imports from Trinidad comprise about 10% of the total imports here. Theoretically, we've had this huge problem. What about the other 90%? Well, it's a theoretical problem only in this case. Why? Because they didn't bring the case against one or two countries. They brought a case against 12 countries, and Trinidad was only one. We have exactly the kind of information. Mr. Lyons just told you in the commission's opinion that they need for 80% of the imports subject to the analysis, 80%. They have not only the foreign production capacity, the capacity utilization, where they ship, how much excess capacity. They have product-specific pricing data for every one of those countries. So would you constrain the BRASC test to being in instances where the commission has that information readily available? I don't think you can read it that narrowly, but certainly in this case, whatever BRASC may say generically about its limitations, they simply don't apply here because of the abundant record evidence that was before the commission. Now, as I recall in your brief, you do take issue with the commission's application of the so-called BRASC test by saying that it did not require a rebuttable presumption. Am I right about that? I take issue with the commission's characterization of the term, rebuttable presumption. To me, the provision that you read from BRASC, it's not the importer's burden to demonstrate injury by reason. It's the commission's burden. That's right. This is an investigative process, and if the commission is going to conclude that injury to the domestic industry is by reason of imports from Trinidad, it needs to provide a reasoned explanation supported by substantial evidence for that conclusion. That's all the court was saying there, and what has the commission said in this case? Well, there's ample evidence. That's their term, ample evidence of substantial excess capacity, not only in the 11 countries that they already had information about, but they went out and collected information on countries like China and other exporters that were coming into the market and said there is ample evidence that these exporters in the aggregate from other non-Trinidadian sources could replace imports from Trinidad if they were so inclined, if they were so inclined. Well, here's where fundamental economics and commerciality takes over. Judge Zagel mentioned, isn't it sort of true that if you've got a commodity product, by definition, they're going to come in and replace? We're talking about the world's largest market for wire rod. All these suppliers are already in the market, and what the commission found is that many of these suppliers were selling at prices lower than Trinidad and Tobago. Okay, so you ask yourself, you put yourself in the position of giving the domestic industry their best case. Eliminate Trinidad from the market entirely, and what happens? It's inconceivable that there wouldn't be backfilling from these significant suppliers in the market selling at lower prices. Is a purchaser actually going to pay more from a domestic producer than they were paying from Trinidad when there's an abundant supply of other suppliers willing to sell it to them for less? That's what economic logic and commercial reality dictates, and the burden is then on the commission if it's going to reach the contrary and counterintuitive conclusion to explain why that isn't going to happen and based on what evidence. And the commission said in this case they don't have any evidence that it wouldn't happen. So this notion that somehow their hands were tied, that it's this rebuttable presumption, and gosh, we couldn't have reached this conclusion except for this unlawful or rebuttable presumption just doesn't hold up to analysis. They didn't reach an affirmative conclusion because the law wouldn't permit them to because they didn't have any evidence that what economic logic and commercial reality tells you would happen wouldn't in this case. And if Trinidad had been out of the market and all the imports that were in the market filled their place, there's no conceivable argument that Trinidad alone was causing injury. And I want to get to your point about the mugging because it sounds like a good idea until you think about it this way.  of sequential acts in the market. One day the market's empty and Trinidad comes in and undersells and the U.S. industry loses sales or has to lower its price. That's not the way this market works. 41 suppliers in this market during the period of investigation from other countries. This is a market that is operating on a simultaneous basis with lots of people going in and the domestic industry is struggling to figure out, okay, who's the low price leader? Well, what do we know from the record in this case? It's not Trinidad and Spago. That was an explicit finding. We also know that in this case the imports from Trinidad were alleged to have caused lost sales and lost revenues. Commission staff investigated those precise allegations that came from petitioners' companies. But what did the commission find?  a single instance where the domestic producer had lost a sale to Trinidad or had been forced to lower its price. So the notion that somehow we're just forced to make up a negative determination here just doesn't hold up. This record overwhelmingly points to a negative. And I want to talk a little bit about the commodity product because there is no reason in the world to send this case back for that issue and here's why. Mr. Lyon. I think we're on the same page here but the predicate for the argument for sending it back, of course, is the assumption for purposes of argument that we would say we did not intend to bind the commission's hands by virtue of anything said in Caribbean Ispan. I think you were... Your Honor, we're on the same page. Okay. So page 5 of the remand determination. Okay. A601 in the appendix. First full paragraph. The court did not remand the commission's findings, underscore, dot, dot, dot, with respect to domestic-like product, domestic industry definitions, negligibility, and accumulation. Well, and so they adopt those. In whole, what did the commission say in its original determination about commodity products? I'm quoting from page 30 of the original determination, page 75 of your appendix, following over to 76, and I quote, thus the record reflects a high level of fungibility between subject imports from Trinidad and Tobago and the domestic product and between subject imports from Trinidad and Tobago and imports from each of the other subject countries. High level of fungibility. Okay, not sort of generally interchangeable. Fungible means indistinguishable. Purchasers treat fungible products as indistinguishable and freely replaceable. That's the definition. So the commission didn't merely say fungible. They said highly fungible, and they readopted that finding explicitly on remand. Now, what about the commodity product question? You go to page... Let's see. Okay. Again, in the remand, back in the original determination. This is from A99. Quote, subject imports from Trinidad and Tobago are concentrated in the commodity wire rod products. Low-medium industrial standard quality wire rod. These products are sold by many suppliers. The market for these products is very price sensitive. Same page, note 235. The other significant category of wire rod imports from Trinidad and Tobago is the high-medium, high-carbon industrial quality wire rod category, which is also a commodity category and supplied by many suppliers. And as Mr. Lyons just informed you, that was 90% of the imports from Trinidad and Tobago. Commodity product, express finding, sold by many suppliers, express finding, market-sensitive pricing. Those were all findings, and if you go back to page 5 of the remand determination, what do they say? We therefore adopt and incorporate those sections of our original views in their entirety, referring to accumulation and the high fungibility. Next, we further adopt our legal framework findings, analysis, and conclusion from the original views with respect to volume, price effects, and impact of the subject imports from Trinidad and Tobago. Those findings explicitly refer back to the ones I just read to you about commodity product. This is now law of the case. It is over. They have made, on two occasions now, an express finding that imports from Trinidad are commodity products sold by many suppliers, including all of the other subject suppliers in this case. They had every opportunity to distance themselves from that finding in this case, and they did not do so. If they had said, we disagree with our earlier opinion, and here's why we might be having this discussion about whether that was a reasoned change in course, but there's absolutely no basis for this court to send this issue back for a remand. They're stuck with those findings, whether they now like them or not, because they expressly reincorporated them into their remand decision. Once you get beyond the commodity product issue, this case really turns into this debate about whether there's an irrebuttable presumption. They don't challenge the finding that all of these suppliers had ample excess capacity. They don't challenge the finding that they were all being sold at prices, or many of them were sold at prices lower than Trinidad and Tobago. Those findings essentially are given. They're not under attack here. The only finding that they attack is that, well, the commission shouldn't have presumed that replacement would occur, but we've just gone through that. It could take you 99.99% of wood when you're talking about the brass construct of a commodity product that sells essentially, exclusively on the basis of price. So this whole could versus would thing, to me, again, is a red herring. Unless you've got anything else,  and let this man have any rebuttal time. Thank you. Thank you, Mr. Moran. Ms. Kenton, why don't you take what was your original units for four minutes. Why don't you take four minutes, and if you need... Thank you, Your Honor. Let me start with Mr. Moran's comment that the imports from Trinidad didn't cause injury  to facts such as lost sales confirmation. That is not before the court here. The commission found that imports from Trinidad caused injury when it did analysis of volume, price, and impact. It looked at all of those factors, and it found that those imports alone caused injury. It said we would have issued an affirmative if we had stopped there. So those facts are not before the court. The only part before the court is whether the application of the replacement benefit test, which then reversed what would have been an affirmative decision, was correct. In that regard, Mr. Moran basically says, you know, there were 41 suppliers out there, and we brought an action against about a dozen of them. And the commission and the Commerce Department found those dozen were causing injury to this industry, and were dumping product, and were causing an injury to this industry that should result in the imposition of any dumping orders. What he's basically telling you is that any time you have a situation like that where you have multiple countries, and you have one that's a severe country that therefore gets its own injury analysis, that we could never get relief, even though the statute expressly contemplates that there would be a separate injury analysis against them. Why? Because you always have other countries in the market. It's basically like saying, if there's one country that comes into the market and causes injury, you get relief. But if there's a gang of countries that come in, you don't get relief because we'll just say that one interchanges for another. That is not the way the law works. This law has a long and rich history of looking at aggregate impacts of imports. That's why the accumulation provision of the statute was created. The law contemplates that if you look at imports in the aggregate, you look at imports individually for severe countries, and you determine whether they are causing injury, but you don't say because there might be other import sources out there, somebody gets denied relief, as he is urging that this court do. You can see, part of the problem  is this is referred to as a replacement slash benefit test, which strikes me as very awkward. I think, basically, what Bratz was talking about was a replacement slash benefit test applied in a particular situation in which replacement, which probably is the most common form of negating benefit, was applied. But my basic question to you is, in order to get relief, do you have to show that you get some benefit? No. I think the answer to that is unequivocally no. The statute does not require that we show that we get some benefit to obtain relief. There is nothing in the statute that suggests that we should have to get some type of relief to be able to obtain an anti-dumping order. Obviously, the statute was written because it was presumed that if you put an order in place, there would be some type of relief, and that relief is quite varied. It isn't simply avoid in the market from imports. It could be price relief, it could be other types of relief. But it is not required that a benefit accrue to an industry in order for the order to be imposed under the statute. Let me ask the question in a different way. I think the question is whether there is any benefit. Even if the commission concluded that this will have no economic effect on the domestic industry. As Mr. Lyons said, these cases are very factually intensive, and the commission looks at all types of variables. If there was a situation where there is nothing here to protect, why put meaningless relief in that situation? The commission would look at that in the context of whether they should consider that variable. That is quite different from saying we are going to start speculating as to whether other imports might replace other imports. That is not part of the inquiry that the commission would undertake. That is quite different. What is troubling the court is that the commission is imposing duties in the abstract where it is not benefiting anybody. They are looking at a whole range of factors. What they are not looking at is whether theoretically replacement could occur. This is the point I wanted to make in answer to a question that you asked of Mr. Lyons regarding non-attribution. My answer to that is no. They are very different. If you look at whether imports cause injury and you say we are making sure they cause injury alone and we are not attributing that to other people, that is a present         because that's the best thing you can do. You need to base your inquiry on the record facts and that is proper under the statutes. If you instead say, okay, we found that, check off that box, now we're going to say, theoretically, disregarding what actually happened in the market, would it be possible that some other imports could have come in during this time or place or in the future or whenever, that is the part that  think is important. I think that not only can you look at this analysis that we discussed earlier, but you can look at the term commodity in a more narrow fashion. As Mr. Moran said,  first of all of this was Gerald Metals and what did the court require? They said these were perfect substitutes if not the exact same product. That's where this whole concept started. It was a very unusual situation where the court had to make some earlier decisions on accumulation analysis. The commission has clearly said it does not believe the analysis of commodity is the same as the analysis of competition for accumulation. To try to pull from an earlier statement and say this is what the commission found here is wrong. You need to read precisely what the commission said. There what it says is the federal circuit appears to suggest that our finding on fungibility in this accumulation context has to apply here. We feel constrained to do it. We do not believe that the two inquiries are the same. They cite the big case that the lower court articulated saying in accumulation context you're looking at a lower level of fungibility than in a causation context. They say they're not the same inquiry. You can't assume simply because we made the finding here that we made the finding there. Under the Burlington case, you have to pull the decision based on its rationale. The commission very clearly says it was constrained to find it was a commodity. Every bit of the aspects of the record contained a void of information of the type that Mr. Moran would like you to look at. It doesn't discuss that at all. You cannot sustain the commission as finding the evidence based on record evidence. I'm happy to accept Mr. Moran's urging you to look at the evidence of record. We were not looking at the evidence of record here. We felt constrained. You appeared to hold this. We've gone off on that tangent. Wood versus could, those are different inquiries. I would urge you to look at the analysis that Mr. Moran sets forth in his brief. It's all post-talk rationalization. The commission never looked at any of those factors. It said there was no evidence to support finding that could meant wood. It drew the line at that point. Thank you. We thank all counsel for working over time. A very helpful argument on all sides. Thank you. The case is submitted. Thank you.